**HERBERT J. SCANLAN, Plaintiff**

v.

**MICHAEL LAI, Defendant.**

High Court of American Samoa
Trial Division

Before RICHMOND, Associate Justice, LOGOAI, Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, Paul F. Miller
 For Defendant, Malaetasi M. Togafau

## OPINION AND ORDER

Plaintiff Herbert J. Scanlan ("Scanlan") initiated this suit on March 12, 1999, alleging that defendant Michael Lal ("Lai") breached the lease for a certain commercial building in Fagatogo, American Samoa. Scanlan requested relief in the form of specific performance and damages for lost rent and other consequential losses. Lai answered on March 19, 1999. Trial took place on January 20, 2000, with both parties and their counsel present.

## Facts

Scanlan and Lai entered into a lease agreement on February 1, 1995, for the commercial building at issue. The lease specified the term as 10 years and the monthly rent at the greater of $2,500 or $2,000 plus 2% of the gross income. It also contained a provision whereby the agreement would be "reviewed after first five years for reconsideration, readjustments, amendments, as to agreeable new terms by both parties." Despite the written terms of the lease, Scanlan verbally asked for payment, of six months' rent in advance, $15,000, and Lai complied with this request.

Lease in hand, Lai occupied the building and opened the Evergreen store. A few months after entering the lease, Scanlan wrote Lai a letter, dated May 3, 1995, stating that the lease was effective for five years, with an option for another five years. Scanlan also proposed in this letter to give Lai one and one-half months' free rent, $3,750, if Lai paid another three and one-half months' rent in advance, $8,750, before Scanlan's departure on a trip to Hawaii on May 8, 1995. Lai also complied with this proposal.

In July 1996, Scanlan completed construction of a stairway, on the exterior of the adjacent building that led to the second floor. The stairs were installed on the Fagatogo *malae* side of the existing stairs located on the adjacent building. Lai did not object to the additional stairway during its construction. However, Lai alleges this staircase so blocked the view of the entrance to the store that potential customers shopped

elsewhere, thus resulting in materially reduced sales revenue.

Lai complained several times to Scanlan about the new staircase. As a result, in late 1996 or early 1997, Scanlan reduced the rent from $2,500 to $2,250 per month. At Lai's suggestion, and the parties also discussed relocating the store entrance to the center of the street side of the leased building. However, they disagreed over mutual sharing of the cost, and the entrance was not moved. Lai also asserts that Scanlan orally promised him at this time that if the business continued to deteriorate over the next year, Scanlan would release him from the lease. Scanlan denies recollection of any such promise.

Lai's sales revenues materially declined in 1997. By the end of the year, he wanted to move out. However, Scanlan persuaded Lai to stay on for another year. Again they discussed relocating the store entrance, but nothing came of it. Lai's business declined further during 1998. On December 1, 1998, he gave Scanlan notice that he would be vacating the building at the end of January 1999. Lai did in fact vacate the premises on or about January 22, 1999. Thus, he occupied the building and paid his rent obligation for only four years of the lease term.

Scanlan advertised the vacancy in a newspaper for about three months at a cost of $20.00. Several persons showed interest in leasing the building, but not for the amount of rent established by Scanlan. Scanlan then located his video store in the building. Scanlan owns the building and does not require the video store to pay rent, but he testified that the video store could only pay rent in the amount of $1,000 per month and remain profitable. Scanlan later relocated the store entrance to the center of the building as the parties had discussed.

## Discussion

A. Lease Term

We turn first to the lease term. The lease itself clearly states, in paragraph 1, that its term is 10 years. However, Scanlan's letter of May 3, 1995 to Lai just as clearly states that the lease term extended for only five years, with an option for another five years. We are thus faced with a glaring contradiction in these two documents, both prepared by Scanlan, regarding the term of the lease.

As a preliminary matter, we are not barred from considering the contents of Scanlan's letter by the parol evidence rule for two reasons. First, it is later in time than the lease, and second, it assists in interpreting the lease. CALAMARI & PERILLO, THE LAW OF CONTRACTS §§ 3.2(a) & 3.9 (4th ed. 1998).

■ Interpretation of the lease does, however, begin with the document itself. If the document is not ambiguous, its plain meaning controls and we need inquire no further into the intent of the parties. *See Toys "R" Us, Inc. v. NBD Trust Co. of Ill.*, 904 F.2d 1172, 1176 (7th Cir. 1990). Paragraph 1, establishing the lease term of 10 years, is anything but ambiguous. Paragraph 2, however, is as clear as mud.

Paragraph 2 states that the lease is to be reviewed after five years for "reconsideration." Reconsideration, in the context of a lease, is not a term of art and its meaning is thus ambiguous in this document. It could mean that the parties were to reconsider certain terms of the lease at this time, or it could mean that they could reconsider whether to continue the lease agreement in its entirety.

■ When, as is the case with paragraph 2, a provision is ambiguous, it may be interpreted according to the parties' subsequent conduct. *Harris Trust & Sav. Bank v. LaSalle Nat. Bank*, 567 N.E.2d 408, 412 (Ill. App. 1990). At this point in the analysis, the letter's contents explicitly show that Scanlan took the position that the "reconsideration" provision in the original lease limited its term to five years. Lai did not object to this interpretation, and thus it is determinative of both parties' intentions. For these reasons, we conclude that the lease extended for only five years, from February 1, 1995 to January 31, 2000.

Lai vacated the premises in January 1999. The lease of five years expired on January 31, 2000. Accordingly, if Lai has breached the lease agreement, he is liable for the 12 months following his abandonment during which the lease remained valid.

B. Breach

■ A tenant who abandons occupancy before the expiration of the lease without any legal justification remains liable for rent. *Mesilla Valley Mall Co. v. Crown Indus.*, 808 P.2d 633, 635 (N.M. 1991). Lai would have been justified in moving out and refusing to pay rent if Scanlan breached the implied covenant of quiet enjoyment owed by all landlords to their tenants. Generally, the covenant of quiet enjoyment allows a tenant to cancel the lease with no liability if the landlord "substantially interferes" with the tenant's use of the property. *See Am. Dairy Queen Corp. v. Brownport Co.*, 621 F.2d 255, 258 (7th Cir. 1980). In commercial settings, "substantial interference" has been interpreted as meaning that the landlord must unreasonably interfere with the tenant's ability to conduct business. *Id.*

The question of whether Lai breached the lease turns on the interference with Lai's business caused by Scanlan's stairway installation. While the stairs could affect Lai's business, we do not believe that the prospective

customers' view of the store entrance was blocked to the level of "unreasonable interference" with his business. Lai's other excuses do not help him. Lai's overture to move the store entrance so that it was clearly visible to potential customers was discussed, but the parties never reached any meeting of the minds on this proposal. While Scanlan could have promised to accept surrender of the premises if Lai's business continued downhill, Lai has failed to prove the existence of this promise by a preponderance of the evidence. Thus, Lai was not justified in abandoning the property and withholding rent, and he is liable to Scanlan for the 12 months remaining on the lease.

## C. Scanlan's Remedies

When a tenant has abandoned property without good cause, the landlord has three options. First, he may hold the tenant to the lease and continue to collect rent. Second, he may accept the tenant's surrender of the property and re-let the premises, in which case the tenant is relieved of liability. Third, he may relet the premises on behalf of the tenant, in which case the tenant must make up any difference between the amount he owes in rent versus the amount collected from the new tenant. *Crolley v. Crow-Childress-Mobley No. 2*, 379 S.E.2d 202, 204 (Ga. Ct. App. 1989). Specific performance is not available.

The landlord is obligated, however, to mitigate any damages flowing from the tenant's liability by the amount of the rent collected from a substitute tenant. *Marco Kona Warehouse v. Sharmilo, Inc.*, 768 P.2d 247, 251 (Haw. Ct. App. 1989). A landlord must exercise due diligence in making reasonable efforts to re-let abandoned premises. *Tempe Corporate Office Bldg. v. Ariz. Funding*, 807 P.2d 1130, 1135 (Ariz. Ct. App. 1991).

Testimony offered at trial estimated the amount of rent allocable to the video store' occupation of the building to be $1,000 per month. Lai is liable for twelve months rent at $2,250 per month, for a total of $27,000. The video business occupied the building in question for nine months of the 12 month period for which Lai is liable. At a rate of $1,000 per month, this reduces the amount owed by Lai by $9,000, leaving the amount of Scanlan's lost rent at a total of $18,000. Scanlan may also recover his advertising expense of the $20.00 as consequential damages. Thus, the principal amount of Scanlan's damages is $18,020.

Prejudgment interest is awarded on each installment of rent, less mitigation, calculated from the date the installment fell due. *Robinson v. Peterson*, 375 So.2d 294, 297 (Fla. Dist. Ct. App. 1979). Using an interest rate of 6% per annum, and applying the video store rent for nine of the 12 months, the amount of prejudgment interest is $734.46. Adding prejudgment interest to the entry date of the judgment produces a

final sum of $18,734.46. Scanlan is also entitled to his court costs, based on an affidavit submitted by Scanlan's counsel, and post-judgment interest at the rate of 6% per annum on the full amount of the judgment.

## Order

Judgment shall enter in favor of Scanlan against Lai in the in the amount of $18,734.46, including prejudgment interest, plus actual court costs. The total judgment, including costs, shall bear post-judgment interest at the rate of 6% per annum from the judgment entry date until the judgment is paid in full.

It is so ordered.